Good morning, your honors. Todd Burns, Federal Defenders of San Diego on behalf of Mr. Duran. I'd like to begin by addressing some of the sentencing issues I've raised in my briefs with a focus on the procedural aspects of those issues. Before and during sentencing, Mr. Duran raised a number of issues that counseled for a sentence below the sentence eventually imposed by the district court and indeed below the low end of the guideline range found by the district court. Those included a wealth of support from family and friends including over 50 letters included from the parish priest, from a former Mexican congressman, impressive educational achievements that he had worked his way through school and become an engineer, impressive work achievements at 27 years old, he supervised 50 people and was earning approximately $30,000 in Mexico, impressive charitable activities including involvement with the handicapped and the poor, that he had no prior law enforcement contacts, that he'd be deported and present no threat to the people of the United States upon his deportation after he was done his criminal sentence, that he had marginal involvement in the overall offense, and that he was duped into thinking that he was actually smuggling marijuana and not cocaine. And he took the stand and lied and obstructed justice. That's true and that was factored into his sentence. That was, of course, well factored into his sentence. You've got to be able to consider all that as well as those aspects which put him in a more favorable light and the district court did that. I understand that, of course, the district court must, not only is entitled to, but must consider aggravating factors. My concern here is that the court almost completely considered aggravating factors and said very little about the mitigating factors. And the mitigating factors I just set out, there were a wealth of them, they are the sort of factors that courts routinely look to to grant either a variance or a departure in sentencing in drug cases and in cases in general. And on top of that, this case, as I was going through the briefs and sort of listing those various mitigating factors, I thought, well, geez, I might be faced with three judges looking at me saying, this guy sounds too good to be true. How the heck did he end up in this situation? And I must tell you, I've been doing this for about ten years now. And I know, Your Honor, Judge Reimer, you've certainly seen several border bus type cases. Judge Smith, you probably have as well in the time you've been on the bench. I'm not sure about Judge Corman. But I can say from my experience, this was a unique, sweet, generous, singular client. I have never seen anyone in his sort of circumstance with all of his mitigating factors do something like this. And I think it's fair to say that Judge Hayes probably has not seen someone like this, too. So when you consider that he's in a very unique circumstance in all those mitigating factors, I think it's incumbent upon the district court to say, well, why don't those factors counsel for a lower sentence? What did he do wrong, though, counsel? Well, we, as you know, we owe discretion to Judge Hayes. He has to use his discretion on this situation. What did he do wrong? I mean, I understand you would weigh the mitigating factors differently than what Judge Hayes did. But from reading the record, it appears that the lying, which Judge Reimer made reference in his obstruction of justice, at the end of the day overwhelmed the judge's consideration of the mitigating factors because it was, it went to the heart of the justice system, went to the heart of, indeed, perhaps even the credibility that the district judge placed on the mitigating factors because he was lying in open court and admitted that, in fact, he had known about all this. Well, I think that procedurally there are two things that the district court did wrong. One is that Cardi makes quite clear, and based on a citation to Rita, and the Supreme Court Rita case makes quite clear, that when a party raises a specific non-frivolous argument tethered to a relevant 3553A factor in support of a requested sentence, then the judge should normally explain why he accepts or rejects that argument. And here we have several arguments. And perhaps it would be acceptable for the judge to say, look, I've seen all these letters. I've seen all these good things he's done. But because he lied to this court, that so overwhelms everything else that I discount all that. But, Judge, the district court didn't do that. There are two places. He didn't just impose a sentence. He didn't say, I'm imposing a sentence, period. He gave, he spoke at the sentencing the judge did. That's true. And he said certain things. That's true. And why can't we infer that he, you know, from what he said, that he basically considered it? Does he have to go through some ritual? Well, I think that, again, when you're confronted with a case that is as unique as this case, the defendant with as powerful and as unique mitigating factors as this defendant, that the language from Carty, which says the judge must explain why he rejects bases for going to a lower sentence, it becomes all that much more powerful. I mean, it's quite clear why. In reality, there are two. Can I just cite something to you following up on Judge Corman's question? This is from the colloquy on December 6, 2007. It's page 370 of the record. The judge said, Counsel, the matter is on for sentencing. Prior to today, I have reviewed and considered the pre-sentence report, the defense's objections to the pre-sentence report, the addendum to the pre-sentence report, the defendant's sentencing memorandum and attachments, which did cover each of the points you made, the government's sentencing memorandum in opposition to the defendant's sentencing memorandum, the defendant's reply to the government's response and sentencing memorandum, the government's sentencing memorandum, the government's supplemental motion regarding safety valve, the defense's response to the government's opposition to safety valve, and the defendant's motion to compel discovery and to continue the evidentiary hearing. What more does the district court have to do? I mean, admittedly, there were all kinds of things, including each of the things that you in good faith referred to in these documents, but surely Cardee does not require the judge to make specific reference to all of those things that are incorporated in the voluminous record that the court said it reviewed. No, but I think Cardee does require the district court to explain why he's rejecting such a wealth of material that indicates a lower sentence than the guideline and the range that he's imposing. And when it came time to do that, there are two parts of the record in which the judge touches ever so briefly on some of those factors, and that's on pages 391, lines 1 to 13 of page 391 of the excerpt, and page 394, lines 16 to 17. And in neither of those references is there any explanation why all of these factors are being discarded. And moreover, there's no explanation as to why the district court has chosen the high end of the guideline range. This is a guideline range that spans two and a half years. The statute 3553C2 or C1 is quite clear that when you've got a sentence that's that high, that guideline range that spans that much time, the district court needs to explain why he's choosing a point in the range. And here, you know, there may be some presumption, well, the guidelines are a starting point, et cetera. But this is a guideline range of two and a half years, and maybe there's a guideline sentence within there that's lower that could be appropriate. But there's no explanation as to why to go to the high end of the guideline range. So that's missing, too. Those are sort of the two procedural aspects, CARDI and the failure to say why the court is picking the high end of the guideline range. And, I mean, there really just is no explanation. And, I mean, I want to be delicate when I say this, but there is some concern based on the sentence. And I know that the court will say, well, Mr. Duran lied, and that's accepted. That's the finding, and he has to be punished for that. But the punishment is not just a sentence for perjury or for lying. It's effectively, you know, doubling or tripling the sentence. And there becomes a concern of chilling a trial right at that point when you triple someone's sentence for going to trial. And I think that in that situation, so there's not an inference or a concern in that. Again, it sort of augments that there should be some explanation as to why I'm giving you a high end sentence dramatically higher than you would have received it throughout the court. What are you citing for the proposition that the district court has to explain specifically the reference, say, to the mitigating factors? What case are you citing? Look, I quoted from Cardi earlier. It says the judge should normally explain why he accepts or rejects. Would anyone like to know what Cardi means? I'm happy with what it says. I think, you know, again, when you combine it with the parsimony clause and you combine it with the C1 subsection, and in this specific case, that there should be some explanation as to why listings are being rejected. The court can speculate as to why the judge did it. The court can speculate, well, he perjured himself. But it's the district court judge's job in the first place to give the court reasons for the court to review. And the court didn't give reasons as to why. Why the high end? Why rejecting all of these mitigating factors? Perhaps if the district court had, the court would have said, well, those were taken into account in another area. Maybe it's sort of double counting. Perhaps at which there was an obstruction adjustment. Perhaps if the district court had given reasons, maybe the district court, now this is hard to believe, but maybe the district court would have said, well, it's because he went to trial and I want to send a message. I mean, we need to know these things so we need to know how persuasive those reasons are. And maybe if the district court had actually gone through all these factors, you know, enlisted them and said this is a unique case, maybe the district court in doing that and going through that exercise would have thought differently about the sentence and would have given a low end sentence or some other sentence. But we don't know any of that because it didn't happen. And that last thing I said I think is important because I think when you sit down and you really look at these things, the wealth of factors in the specific situation of Mr. Duran, that it causes a second or third thought. Because, again, I have never seen an individual in his situation engage in this sort of activity. He's a fairly young man, a stupid decision, horrible consequences for his life. You know, I guess we might ask this 12 and a half years, given all the factors, is that a reasonable sentence? Does that make sense? I've chosen not to dwell on that argument because I think the procedural arguments are better. But I really wonder, are we all really served by this man being in prison for 12 and a half years? Is society served by that? Well, you know, he did. I'm not unsympathetic to your argument, separate and aside from whether you were entitled to any legal relief here. I might have given him a lesser sentence. But the biggest mistake was to turn down an incredibly generous plea that he was offered. Well, in retrospect, that's probably true. And, you know, I don't know how generous it is. It's a fairly cookie cutter. But compared to what he got, it certainly would have been, he could have, I mean, at this point he's looking at getting out of prison when he's 40 years old. Will he ever, you know, marry? Will he ever have kids? Will he ever have a normal life? You know, prison is, of course, a violent place. This is a nonviolent person. What will he be like when he gets out after 12 years? I don't know. But, again, I think if the district court, especially in a case like this, is put to the requirement, set out in CART, you've explained why you're going to reject all that and impose this long a sentence, that maybe the sentence would be different. I want to turn to the evidentiary rulings at trial, recognizing that the panel may not be overly sympathetic to them. But I do believe that it's quite clear that those rulings and their effect on trial are based on what happened at trial, not post-trial statements. I think this Court's Salazar-Lopez holding makes that clear and the Supreme Court's Sullivan holding, which are both set out in my brief. The thrust of the defense was that it didn't make sense. There was no financial motive for Mr. Duran to make this, to commit this crime. He was, you know, a relatively well-paid professional, you know, on his way up the ladder in Mexico, making a good salary, $30,000, a good salary in Mexico. Well, even assuming relevance, it's got to be ever so slightly marginal, because no matter how much money you had, you can always want more. I mean, it only goes so far. But assuming it's relevant, Duran was able to testify and did testify how much he was making and what he thought his prospects were, which was a $3,500 bonus, I think, and a likely promotion. So the excluded testimony would have been simply cumulative. So even assuming relevance, it would have been cumulative. I mean, how could it be an abuse of discretion? Except that a defendant's testimony with respect to – and again, because I think there's synergy. Well, nobody contested it. I mean, he said, I made $25,000. I'm going to get a $3,500 bonus. Probably going to get a promotion. And the government didn't contest it. Nobody challenged it. That wasn't true or it was unrealistic. Well, I believe that the government did contest it, although in a somewhat subtle manner. As I set out in my reply group at page 26, they went through a long argument about how Mr. Duran was unbelievable, et cetera, and the only person that was believable in this case was this gentleman who managed Western Auto Shop and went through attacking his credibility and then came to the point where they said, Mr. Duran testified as to his salary. Well, I mean, there was no – in the trial itself, apart from argument, I mean, in the trial itself there was no challenge to his salary. Well, but it's sort of – it's arguably prosecutorial. And how could any of the other people – I mean, maybe his employer had foundation, but I mean, his brother-in-law, there's no foundation for his testifying to how much he was making. His brother-in-law worked at the same company, had held the same job. I work in the same thing, too. I have no idea how much Judge Corman makes or how much – I don't know. With all due respect, I could find out the answer to those questions on the Internet like that. I'm sure you could, but – You'd be disappointed. I mean, no, but that doesn't give you foundation. He didn't say he was a controller. He didn't say he was a – He'd held the same job, and he had looked at the business records. But if there was any questions to that, we asked for a short continuance to put the boss on, who we couldn't subpoena, who was in Mexico. But there were the two other areas with respect to, you know, the cost of living in Mexico and the fact that he wasn't experiencing any financial difficulties. And I know Your Honor has expressed some question as to the relevance, but there clearly is a Ninth Circuit case law which says – It's relevant, but I mean, it's not like it's overwhelming. Well – It's helpful to him to show that it believed he didn't have a motive, but one could believe it and still say he had a motive. Sure, but it's, you know, it's sort of – It's not like it's going to knock you over the head and say, oh, if that's true, he went. Well, I don't know. I find – I still find the whole thing very difficult to believe, knowing all the circumstances of his situation, and if they had known more – Well, I suppose one could counter with the suggestion that anybody who is entrusted to drive $700,000 worth of contraband across the border probably had had a little experience with it. Now, that's just about as speculative as saying because he makes $25,000 a year, he has no motive to do anything that has to do with making money. I mean, they're both sort of plausible. But it's also in combination with the testimony from the case agent that $3,000 to $5,000 would be the going rate for doing this sort of thing. Sure. So it would be like me deciding, you know, take 10% of my salary or something, that for 10% of my salary, all those years I spent going to – you know, working through school and going to law school, that, you know, for 10% of my salary I'm going to run a load of drugs across the border. It's sort of hard to believe. Well, yes, but that cuts lots of ways. Well, but it's a powerful argument for the defense, and it was the thrust of the defense. And all we are left with at the end is his testimony, which was attacked, now not head-on, but was attacked in closing. Well, you can believe it or not believe it. You've only heard it from him. When they've objected, that's probably – They said something more. They said we don't challenge his testimony about what he earned. Well, I think they said you haven't heard any other testimony, but you've only heard it from him, so you can believe it or not believe it. I mean, again, I said they didn't attack it head-on, but we all know what's going on there. It's a none-too-subtle attack on him. Do you want to save? The final thing I'd just like to touch on is the knowingly instruction. That knowingly instruction, which says you can, you know, look at evidence of acts, statements, and omissions, is not given that part of that, that omissions part of that instruction, is not in any other circuit that has a model knowingly instruction. In this instance – I should imagine that, the Ninth Circuit being different. I'm shocked. This time in a bad way. If I may, it's my impression that there is absolutely nothing in the trial record itself that would suggest, even hinted, that he was exercising his right to be silent after the arrest. I mean, it just wasn't – in lots and lots of trials, I mean, there's stuff about it. You know, you're arrested and you did or didn't say anything to the cops, and the only evidence that I believe is in there is that he in fact did talk to the inspector at secondary. So what's the basis for your concern? Even if in the abstract that instruction is problematic. Well, I think it's a natural thing to wonder, and I can't remember the case site. It might have been Carter. There's a Supreme Court case site that talks about that even people who should know better are often sort of wondering, well, what sort of statement did they make after the fact? You know, things that implicate the Fifth Amendment, because people think the Fifth Amendment is sort of, I think they say it's a cover for the guilty. I can see it, if there was actually something in the trial that brought that up, but, I mean, you just would have to have a wild imagination, wouldn't you? Well, I think the instruction brings it up, and part of the reason the instruction brings it up is there is no affirmative evidence of any omission. Well, an omission could be the failure to ask more questions, like why are you willing to forgive this loan for me to carry this truck across the border or drive the truck across the border, which he apparently did on several occasions during this weekend, if my recollection serves me correctly. But an omission could be a failure simply to ask questions of somebody who asks you to do something, of not making a sufficient inquiry into what you're exactly being asked to do. It doesn't necessarily call up in my mind listening to it in the abstract. Is it a failure to, is it an exercise of his Fifth Amendment rights? But I think, you know, here there's no affirmative evidence that he didn't follow up with something. So all you're left with is, there's no evidence of omission. So the governance argument is, well, there has to be, it's preceded by evidence, and evidence is these things, and you're not left with any evidence of an omission. So you're just left to wonder, well, what does omission mean? And the most obvious thing it could mean is that he never told this story before. Thank you. Good afternoon, your Honors. Joseph Green on behalf of the United States. I'm representing the government on appeal, and I was also the attorney at Trot. So I'm happy to answer any questions you have about the record. And if there aren't any to begin with, then I'd like to just touch briefly on a few of the points that were raised by your previous discussion. First of all, Judge Hayes complied both with the requirements of 3553A, 3553C, and all the requirements that the Court has set out in Cardi and the other related cases. Judge Hayes went through a detailed discussion of Mr. Duran's history, of his characteristics, of the nature and circumstances of the offense. And after he had correctly calculated the guideline range, he balanced all those factors. And while, granted, he did not say the magic words that he chose this particular point within the range, he demonstrated through his review that he had considered all of the things that are raised now by Mr. Duran on appeal. Does Cardi require anything more? No, I don't believe it does, Your Honor. And I think that point's illustrated by United States v. Duran, which I think preceded Cardi. But I think the principle is still valid even after Cardi. There's a couple of points I wanted to talk about. The first one was Salazar-Lopez. And this dealt with this concept of whether the Court ought to consider Mr. Duran's post-trial statements in determining whether he was prejudiced by any errors that might have occurred during the trial proceedings. And on this point, to my knowledge, there's no case that says that the Court can't consider that outside of the Apprendi analysis. Salazar-Lopez was a case that dealt with Apprendi. And what had happened there was after the jury's finding, the defendant entered into some stipulation or made some admission that impacted whether or not the government had satisfied its burden to prove the illness charged in the indictment. That's not the case here. Mr. Duran's statements after the trial had nothing to do with whether or not the government had met its burden. And as a result, those cases shouldn't apply in the Court ought to consider them. In other words, in order to determine whether you met your burden of proof at trial, we should consider his post-trial statements that he made in order to try and get leniency in sentencing. I'm sorry, Your Honor. I'm hearing you correctly that in order to determine the sufficiency of the evidence at trial, or the strength, rather, of the government's case, we should look to statements that he made after he was convicted in an effort to try and get a lower sentence. No, I don't necessarily say that that's what ought to happen. What the government is urging in this case is that as the Court looks back to determine whether or not there were errors at sentence during the trial, that it is proper for the Court now to consider the defendant's statements that have come out after the trial. Now, if the government hadn't proven its case, and then later the defendant admits, well, you know, I did it. You convicted me, albeit on insufficient evidence. But now I'm just going to tell you that, sure enough, you were right. But that's not what happened here. The evidence here was overwhelming and was more than sufficient to sustain the verdict, and Judge Hayes found as much. So his statements don't really go to the sufficiency of the evidence. Then where do they go to? They go to whether or not the Court ought to reverse or remand or do anything about the district court. If there were otherwise error committed at the trial, you're saying that we should look to evidence outside the trial record to determine whether it warrants reversal or whether error was committed? Yes, Your Honor. I think that it's appropriate to look at it to determine whether or not the defendant was prejudiced. And here in this case, I think it's particularly important because what it shows when you take a look at that is that the evidence that's being complained about as having not been admitted in the trial court was offered to support his perjury. So here we've got the benefit of knowing full well that the evidence about the salary, about the cost of living in Mexico, not only was it not relevant, which was the government's position, but that we know now with certainty that it was offered in support of the defendant's attempt to commit perjury. So I think it's appropriate to consider those. It certainly, I think, is appropriate when you look at the overall goal of trying to make sure that there's a just result in this case. The last point I wanted to make was simply about the government's discussion during closing argument about his salary. What happened at trial was the defendant put on evidence of the salary and the government didn't contest it with any evidence, and there was no cross-examination of him. And then in the closing, what the government argued was that you can take his salary as true or not, but assuming it's true, someone that makes $25,000 would have the same motivation to commit this offense, regardless of how much money he made. So the government really wasn't challenging it. In effect, they were telling the jury, you're more than welcome to believe it. Even assuming it's true, the defendant would have more than enough motivation, which we know now was the case. The government submits. Okay. Ten seconds. Ten seconds. He will do at least ten seconds. I would just request that the court look at excerpt of record 391 and 394. That's the only place at which the mitigating factors are even touched on very briefly, and there's no reason as to why they reject it. Okay. Thank you, counsel, both of you. The matter just argued will be submitted, and the court will stand in recess for the day. All rise.
judges: Rymer, Smith, Korman